UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC MARTIN,

         CIVIL ACTION NO. 12-cv-14286

   *Plaintiff*,    DISTRICT JUDGE MARK A. GOLDSMITH
*v.*         MAGISTRATE JUDGE PATRICIA T. MORRIS

S KAZULKINA, J. MAKIN,
J. STEWART, S. WEBSTER,
RIZZO, LAKSHMI GARLAPATI,
DAHL, HERRING, MELISSA
MILLARD, and McCOLLOUGH,

   *Defendants*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY JUDGMENT (Docs. 103, 109, 112, 127)

## I. RECOMMENDATION

   For the reasons set forth below, **IT IS RECOMMENDED** that Kazulkina's motion for summary judgment (Doc. 103) be **GRANTED**; Makin's motion for summary judgment (Doc. 109) be **GRANTED**, that Martin's motion for summary judgment (Doc. 112) be **DENIED**, Martin's "motion to deny the defendants' motion for summary judgment" (Doc. 127) be construed as a response rather than a motion, and that Martin's complaint be **DISMISSED WITH PREJUDICE**.

## II. REPORT

### A. Procedural History

   Plaintiff Eric Martin is a prisoner who filed a complaint alleging certain violations of his civil rights on September 26, 2012. (Doc. 1). On May 16, 2013, Magistrate Judge

Laurie J. Michelson issued a Report and Recommendation proposing that Martin's complaint be dismissed without prejudice because was a "three strikes" filer under 28 U.S.C. § 1915(g). (Doc. 27). On July 24, 2013, District Judge Gerald E. Rosen issued an Order adopting Magistrate Judge Michelson's Report and Recommendation (R&R), dismissing Martin's complaint in its entirety. (Doc. 38). Martin later filed a motion for relief from that order (Doc. 46), and the Sixth Circuit, on appeal, found that "the district court erred by declining to apply the imminent danger exception, and § 1915(g) does not bar Martin from proceeding [*in forma pauperis*] in this action," vacated the district court's judgment, and remanded the matter for further proceedings (Doc. 63). Thereafter, all pretrial matters were referred to the undersigned Magistrate Judge. (Doc. 64). On January 30, 2016, I issued a Report and Recommendation (Doc. 93), to deny Martin's motions to appoint an expert witness (Doc. 85), for an oral deposition (Doc. 72), for a temporary restraining order, for a preliminary injunction, and for a permanent injunction (Doc. 76). On April 20, 2016, District Judge Rosen issued an order adopting my R&R. (Doc. 106).

The parties then filed various motions for summary judgment. (Docs. 103, 109, 112). Martin also filed a motion to compel discovery (Doc. 122), and a self-styled "motion to deny the defendant's [sic] motion for summary judgment" (Doc. 127).

On November 28, 2016, I issued an R&R suggesting that the Sixth Circuit's February 2, 2015, order (Doc. 63), and Judge Rosen's April 20, 2016 order (Doc. 107) foreclosed all issues in this matter and that dismissal was therefore appropriate. (Doc. 136). On January 3, 2017, Judge Rosen rejected my recommendation, concluding that the Sixth Circuit's February 2, 2015, order remanded this matter for consideration of Martin's claims

2

for compensatory damages, punitive damages, and costs, in addition to his motion for a preliminary injunction, and that his April 20, 2016, order did not terminate Martin's complaint. (Doc. 139). Judge Rosen "re-referred to the Magistrate Judge for further pretrial proceedings, including for an 'on the merits' report and recommendation on Defendants' Motions for Summary Judgment [Dkt. Nos. 103, 109] and Plaintiff's Motions for Summary Judgment [Dkt. Nos. 112, 127], and for determination of Plaintiff's Motion to Compel Discovery [Dkt. No. 122]." (*Id*. at 6, Doc. 140). On February 1, 2017, this matter was reassigned to District Judge Mark Goldsmith.

> ### B.    Summary Judgment Standard

Summary judgment is appropriate where a party demonstrates that there exists "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). In reviewing such motion, the court must view all facts and inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Instead, the nonmoving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. *See* 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the nonmoving party cannot simply assert that the other side's evidence lacks credibility. *See Id.* at 493. And while a *pro se* party's arguments are entitled to liberal construction, "this liberal standard does not, however, 'relieve [the party] of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Veloz v. New York*, 339 F. Supp. 2d 505, 513 (S.D. N.Y. 2004) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D. N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *See Street*, 886 F.2d at 1479-80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992). After examining the evidence designated by the parties,

the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so onesided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### C.    Analysis

#### 1.    Factual Summary of Martin's Claims

Given the lengthy procedural history of this case, stretching back more than four years, it may be helpful to briefly recite the pertinent facts alleged in Martin's complaint.

Martin asserts that on September 23, 2011, Defendants Lakshmi Garlapati[1] and Dahl[2] "threatened plaintiff that they were going to force dangerous, psychotic medication in him even though they knew he wasn't a danger to himself or others due to mental illness." (Doc. 1 at 7). This apparently caused Martin to file a grievance on an unstated date. (*Id*. at 7-8).

Martin asserts that Sofia Kazulkina, a psychologist working with the Michigan Department of Corrections ("MDOC"), drafted a report finding that Martin was mentally ill, and recommended that Martin be involuntarily medicated. (Doc. 1 at 3, 7-8)[3]. Martin

---

[1] Lakshmi Garlapati is a psychiatrist employed by MDOC. (Doc. 120 at 2).
[2] Martin alleges that Dahl was "some type of mental health personnel" (Doc. 1 at 5); he or she remains unserved.
[3] Martin's complaint uses cross-referenced sections and non-linear page numbers. For the sake of clarity, I will use a standardized numbering system to refer to pages in his complaint, including attached exhibits, with his "Prisoner Civil Rights Complaint" page representing page one, and later pages numbered sequentially as they appear.

does not specify the date on which Kazulkina allegedly produced this report and recommendation. However, a report bearing this description, drafted by Kazulkina, and attached to Martin's complaint, bears the date October 19, 2011. (*Id*. at 23). Martin alleges that Kazulkina "knew at the time of making this recommendation that plaintiff was not a threat to himself or others due to mental illness." (*Id*. at 7).

Martin alleges that on October 20, 2011, Garlapati drafted a report and recommendation that Martin be involuntarily medicated with the anti-psychotic Haldol, and ordered that he be started on a regimen of Haldol, despite the knowledge that Martin was not a hazard to himself or others. (Doc. 1 at 7).

Martin also alleges that on October 26, 2011, Kazulkina "told [him] that psychotic medication was going to be forced on him which upset plaintiff and resulted in plaintiff cussing [her] out and calling her names." (Doc. 1 at 8). Martin asserts that, in response, Kazulkina "wrote . . . a major insolence ticket." (*Id*.). Martin further alleges that Kazulkina engaged in "malicious revenge" and "retaliation" for his name calling and threatening that he would file a grievance by "caus[ing] plaintiff to be forcibly drugged with haledol [sic] on 10-27-12[4]." (*Id*. at 8-9). Martin asserts that Kazulkina instructed "nurse herring to give [him] a shot of haledol [sic] . . . even though no authorized hearing was conducted beforehand." (*Id*. at 8-9). Nurse Herring[5] allegedly told Martin on that date that he would

---

[4] I note that while Martin's complaint clearly alleges this event occurred on "10-27-12," this is almost certainly a scrivener's error, since all of the other relevant events in his complaint occurred in 2011, and because his complaint was filed roughly one month prior to that date, on September 26, 2012. (Doc. 1 at 8-9). I therefore find that Martin intended to reference October 27, 2011, not 2012.

[5] Diana Herring is a nurse employed by MDOC. (Doc. 9).

receive an injection of Haldol even if he had to be held down by prison guards, and that she administered a shot of the same. (*Id.* at 9).

Martin asserts that on November 3, 2011, defendants Webster[6], Stewart[7], Makin[8], Rizzo[9], and Garlapati engaged in a hearing to determine whether Martin should be involuntarily medicated with Haldol, and that the panel determined he should be medicated for ninety days. (Doc. 1 at 9). Martin asserts that the decisions of this panel were "influenc[ed]" by Dahl in an unspecified manner. (*Id.* at 8). He further asserts that the decision made by this panel was "not based on sufficient evidence that plaintiff was mentally ill at all." (*Id.* at 11). Martin notes that he complained about being bunked with other cellmates, citing potential violence between prisoners, but asserts that this request is "certainly not sufficient as to plaintiff being a harm to himself and/or others in the past or present." (*Id.*).

Martin alleges that the administration of Haldol caused him to experience "constant tiredness, sleeping all day, night, with drooling of the mouth, and hard to do anything at all, lethargic." (Doc. 1 at 10). He also experienced "blurred vision . . . and [a] constant unsettled feeling, along with hard time breathing, slowed down heart rate" and was "in hell

---

[6] Martin alleges that S. Webster was a "mental health professional" who participated in the hearing committee which ordered him involuntarily medicated. (Doc. 1 at 5, 9). Webster was served on May 13, 2013, but no attorney has appeared on Webster's behalf, and Webster has not filed any pleading, motion, or other document.

[7] Janice Stewart is a psychologist in the employ of MDOC who served on Martin's hearing committee. (Doc. 1 at 5, 31). She, along with defendants Rizzo, Garlapati, Herring, and McCollough are represented by MDOC. (Doc. 120 at 2).

[8] Makin is a psychiatrist who served on Martin's hearing committee (Doc. 1 at 31), but is not an employee of MDOC, and is an independent contractor (Doc. 124 at 5).

[9] Sara Rizzo is a psychologist employed by MDOC (Doc. 9); Martin alleges that she participated in the hearing committee, but he has provided no evidence tending to confirm that allegation (Doc. 1 at 9).

being constantly tortured every second, every minute, every hour, every day." (*Id.*). This suffering was partly relieved only by administration of Cogentin, a medication which Martin alleges "combat[ted] the side effects of haledol [sic]." (*Id.*). However, despite use of Cogentin, the side effects of difficult breathing and slowed heart rate persisted. (*Id.*).

Martin asserts that on or around December 23, 2011, he was administered additional doses of Haldol, despite having "personally notified" Garlapati and Schindler[10] that "he had an allergic reaction to it such as hard time breathing, slowed heart rate." (Doc. 1 at 11). Martin thus alleges the he was in "imminent danger of serious physical injury" via the administration of Haldol. (*Id.* at 12).

As to relief, Martin demands an "amount to be determined by the jury," punitive damages, nominal damages, a jury trial, costs incurred in bringing suit, and any additional relief the Court may find proper. (Doc. 1 at 17).

##     2.     Kazulkina and Makin's Motions for Summary Judgment on Martin's Due Process Claim

At the outset, I note that the MDOC defendants assert in their June 15, 2016, response (Doc. 120) that Martin's motion for summary judgment is not properly before this Court, because the Sixth Circuit had sole jurisdiction over the case pursuant to Martin's May 26, 2016, notice of appeal (Doc. 115). While this was true at the time, the Sixth Circuit disposed of Martin's appeal in its August 23, 2016, order (Doc. 132), and remanded jurisdiction to this Court. Moreover, this matter was re-referred to the undersigned on

---

[10] Martin alleges that Melissa Millard Schindler is a nurse who treated him in some capacity. (Doc. 1 at 6). She remains unserved.

January 3, 2017. (Doc. 140). The Court thus clearly jurisdiction over Martin's case at this time.

Kazulkina argues that Martin failed to allege a violation of his Fourteenth Amendment right to Due Process, because the process provided to him prior to the administration of Haldol was sufficient. (Doc. 103 at 5-11).

Makin also argues that Martin's due process claim under the Fourteenth Amendment fails because he was afforded a hearing wherein the committee determined that "Plaintiff was mentally ill and agreed with psychiatrist Dr. Garlapati's recommendation for involuntary medication." (Doc. 109 at 4-5).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. This language comprises two distinct forms of due process: substantive and procedural.

Substantive due process "protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997). These rights include "constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education." *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 851 (1992). The government is precluded from infringing on these fundamental rights "at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). "Substantive due process [also] prohibits states from involuntarily committing nondangerous mentally

ill individuals." *Bolmer v. Oliveira*, 594 F.3d 134, 142 (2nd Cir. 2010). However, here, Martin is incarcerated for his criminal activity and is not involuntarily committed due to mental health issues. On the other hand, as discussed below, case law recognizes substantive due process protection of the right to be free from involuntary medication, but once the right is protected by a state-created process protecting this liberty interest, the adequacy of the protection is generally analyzed under procedural due process standards.

Procedural due process "protects those life, liberty, or property interests that fall within the Due Process Clause of the Fourteenth Amendment." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law - rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Liberty interests include "the right of the individual to contract, to engage in any of the common occupations of life . . . and generally to enjoy those privileges long recognized . . . as essential to the ordinary pursuit of happiness by free men." *Id.* quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

States may create a liberty interest, and once that interest is bestowed, it may not be "arbitrarily abrogated," and "minimum procedures appropriate under the circumstances and required by the Due Process Clause" must be provided before the interest is deprived. *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974). Procedural due process does not prevent the deprivation of a property or liberty interest, but rather requires that the government provide an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'"

10

*Davis v. Scherer*, 468 U.S. 183, 202 (1984) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Meaningful procedural due process generally requires that the deprivation process be overseen by an impartial decisionmaker. *See Arnett v. Kennedy*, 416 U.S. 134, 197 (1974); *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 566 (6th Cir. 2011) ("Procedural due process is not satisfied when a person has a protected interest under the Due Process Clause and the individual responsible for deciding whether to deprive that person of his interest is biased.").

The Supreme Court has long recognized that "[t]he State clearly has a legitimate interest in prison security and administrative convenience that encompasses responding to potential risks to persons and property." *Washington v. Harper*, 494 U.S. 210, 246 (1990); *see also Pell v. Procunier*, 417 U.S. 817, 818 (1974). While "prisoners retain rights under the Due Process Clause," these rights are "subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." *Wolff*, 418 U.S. at 556. Where these interests come into conflict, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id*. Therefore, where a state creates a right of "real substance" to which prisoners are entitled, a prisoner may not be divested of that right without "minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Id*. at 556.

In *Vitek v. Jones*, 445 U.S. 480, 493 (1980), the Supreme Court established that while "[a] criminal conviction and sentence of imprisonment extinguish an individual's right to freedom from confinement for the term of his sentence . . . they do not authorize

11

the State to classify him as mentally ill and to subject him to involuntary psychiatric treatment without affording him additional due process protections." The prisoner in *Vitek* was subjected to "transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness;" the Court determined that these measures "constitute the kind of deprivations of liberty that requires procedural protections." *Id*. at 481. The *Vitek* court also determined that the state's interest in "segregating and treating mentally ill patients is strong," but because the prisoner's interest in "not being arbitrarily classified as mentally ill and subjected to unwelcome treatment is also powerful," the state must apply "appropriate procedural safeguards against error." *Id*. at 495.

In *Washington v. Harper*, 494 U.S. 210 (1990), the Supreme Court applied the rule of *Vitek* to a factual scenario similar to the one at hand. Harper was tried and convicted for robbery in the state of Washington, and was sentenced to serve a term of imprisonment. *Id*. at 213. While incarcerated he was administered voluntary psychiatric treatment in the form of antipsychotic medication; he exhibited "violent conduct . . . when he did not take the drugs." *Id*. at 210, 225. Harper began to refuse his medication, and his treating physician sought to have him involuntarily medicated. *Id*. at 214. Prison policy provided that inmates

> may be subjected to involuntary treatment with the drugs only if he (1) suffers from a "mental disorder" and (2) is "gravely disabled" or poses a "likelihood of serious harm" to himself, others, or their property. Only a psychiatrist may order or approve the medication. Second, an inmate who refuses to take the medication voluntarily is entitled to a hearing before a special committee consisting of a psychiatrist, a psychologist, and the Associate Superintendent of the Center, none of whom may be, at the time of the hearing, involved in the inmate's treatment or diagnosis. If the committee determines by a majority vote that the inmate suffers from a

mental disorder and is gravely disabled or dangerous, the inmate may be medicated against his will, provided the psychiatrist is in the majority. Third, the inmate has certain procedural rights before, during, and after the hearing. He must be given at least 24 hours' notice of the Center's intent to convene an involuntary medication hearing, during which time he may not be medicated. In addition, he must receive notice of the tentative diagnosis, the factual basis for the diagnosis, and why the staff believes medication is necessary. At the hearing, the inmate has the right to attend; to present evidence, including witnesses; to cross-examine staff witnesses; and to the assistance of a lay adviser who has not been involved in his case and who understands the psychiatric issues involved.

*Id*. at 215-16. That policy also provided for recording of the hearing, judicial review in state court, and periodic review of the medication order. *Id*.

The Court found that the Washington prison policy "undoubtedly confers upon respondent a right to be free from the arbitrary administration of antipsychotic medication," and noted that Harper "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Harper*, 494 U.S. at 221-22. The Court held that "the Due Process Clause confers upon [the plaintiff prisoner] no greater right than that recognized under state law." *Harper*, 494 U.S. at 222. The Court also found that the prison policy passed rational basis scrutiny because it is "a rational means of furthering the State's legitimate objectives" in the safety of the prisoners and the prison staff. *Id*. The Court "h[e]ld that, given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id*. at 227. The Court also found that the prison policy "comports with these

requirements" and "therefore reject[ed the] respondent's contention that its substantive standards are deficient under the Constitution." *Id*.

The Court then noted that the "procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake" and found that the prisoner's "interest in avoiding the unwarranted administration of antipsychotic drugs is not insubstantial." *Id*. at 229. However, the Court also found that "[n]otwithstanding the risks that are involved, we conclude that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge." *Id*. at 231. The Court further stated that "[t]hough it cannot be doubted that the decision to medicate has societal and legal implications, the Constitution does not prohibit the State from permitting medical personnel to make the decision under fair procedural mechanisms" without a judicial hearing. *Id*. The Court then found that Washington's policy contained adequate procedural safeguards, including independence of the decisionmaker, because none of the members of the hearing committee may be involved in the inmate's current treatment or diagnosis, the policy provided for the right to be present at the hearing, and the inmate could obtain judicial review of the hearing committee's decision. *Harper*, 494 U.S. at 233-35.

The same procedural protections are afforded to Martin under the relevant MDOC policy. MDOC Policy Directive ("PD") 04.06.183 (Doc. 103 Ex. 2) provides, in relevant part, that a prisoner may be temporarily subjected to involuntary treatment with psychotropic medication where the following conditions are met: "a psychiatrist's certificate [is] executed which states [that] the prisoner is mentally ill," the psychiatrist also

14

concludes that the prisoner "is a present danger to himself or herself or to others;" "the prisoner refuses treatment;" and the psychiatrist orders "involuntary administration of psychotropic medication pending the convening of a Hearing Committee." *Id.* at (Q-R).

Prior to the convening of the hearing committee, the prisoner must be provided with a copy of the "Psychiatric Certificate, Psychiatric Report, QMHP[11] Report, and a notice of hearing and rights to the prisoner and, if one has been appointed, to the guardian of the person." MDOC PD 04.06.183 at (S). The prisoner is to be assigned a Mental Health Advisor; the prisoner must not be medicated for twenty-four hours prior to the hearing. *Id.* at (T). The hearing committee must consist of "a psychiatrist, a fully licensed psychologist, and another mental health professional whose licensure or registration requirements include a minimum of a baccalaureate degree from an accredited college or university, none of whom is, at the time of the hearing, involved in the prisoner's treatment or diagnosis." *Id.* at (C). The hearing committee must consider "the QMHP Report alleging that the prisoner is mentally ill, the Psychiatric Report, the Psychiatrist's Certificate, proof that a notice of hearing has been served, proof that the prisoner has not been medicated within 24 hours and any other admissible evidence presented at the hearing." *Id.* at (W). The prisoner has the right to attend the hearing, may bring along his or her guardian, and is entitled to the assistance of his or her mental health advisor. *Id.* at (X). The prisoner may present evidence, including witnesses, and may cross-examine witnesses. *Id.* The hearing

---

[11] Under MDOC PD 04.06.183(I), a qualified mental health professional, or "QMHP" is defined as "[a] physician, psychiatrist, psychologist, social worker, registered nurse, or other health professional who is trained and experienced in the areas of mental illness or mental retardation and is licensed or certified by the State of Michigan to practice within the scope of their professional training."

committee must then "determine whether the prisoner is mentally ill and, if so, whether the proposed mental health services are suitable to the prisoner's condition. A finding of mental illness must be confirmed by the psychiatrist on the Hearing Committee to be valid." *Id*. at (Y). The committee must prepare an official record of the hearing, and must present to the prisoner a report of their findings and orders, along with an appeal form. *Id*. at (Z-AA). The initial period of treatment may not exceed ninety days. *Id.* at (AA). The prisoner may then appeal the hearing committee's decision to the Director of the Corrections Mental Health Program with the assistance of their mental health advisor; prisoner may then appeal that decision to state circuit court. *Id*. at (DD). The policy also provides for renewal of the medication order. *Id*. at (EE-FF). The prisoner is also entitled to a copy of the corrections mental health program ("CMHP") guidebook which contains "rights information," and is to be offered an "opportunity to consult with staff from the Office of the Legislative Corrections Ombudsman." *Id*. at (GG).

Like the State policy in *Harper*, this MDOC policy also provides for an independent decisionmaker because none of the members of the hearing committee may be involved in the inmate's current treatment or diagnosis, for the right to be present at the hearing and present evidence, and the inmate can obtain judicial review of the hearing committee's decision in state circuit court. *Harper*, 494 U.S. at 233-35. Therefore, the MDOC policy also passes rational basis scrutiny and satisfies procedural due process. Martin was not denied any of the procedural guarantees under the policy, *e.g.*, he was not prevented from being present at the hearing. He chose not to appeal to the state circuit court but he does

not even argue that anything prevented him from doing so. Thus, he was given all the process that he was due.

The only difference between the instant case and the issue presented in *Harper* is that although all the parties agreed that the policy had been followed in *Harper*, Martin contends that Defendants violated his rights by failing to make the necessary finding of dangerousness. *See* (Doc. 1 at 3, 7-17; Doc. 112 at 1-4). Martin argues that involuntary medication was administered despite the lack of an express finding that he was a danger to himself or others. (Doc. 1 at 7, Doc. 112 at 2.) It appears that Martin is correct; no defendant found that he was a danger to self or others in so many words. However, this does not equate with a finding that his due process rights were violated.

Kazulkina's October 19, 2011, decision, which bears the title "QMHP REPORT," recommending that he be involuntarily medicated cites that Martin has "refused psychotropic medication since . . . August 2011," inconsistently refused to take medication, because he felt that all unnatural medication was dangerous, but would nevertheless take antibiotics. (Doc. 1 at 23). She also wrote that Martin "exhibit[ed] paranoid ideation," as demonstrated by "refusing to have a Bunkie due to his fear that he will be stabbed . . . although he admits that he has not been harmed by previous bunkies," and as a result was being kept in a "non-bond cell." (*Id*.). She also found that Martin's "thought content revealed delusions and paranoid ideation," along with "poor" reasoning, insight, and judgment, and "fair" impulse control and has a "lengthy history of paranoid and bizarre delusions," as evidenced by Martin's self-report and prison chart, including fear that his "food had been poisoned" by a "female correctional officer [who] put menstrual blood in

his food tray." (*Id*.). Martin had also announced his ability to "cast voodoo spells on others and make them sick," admitted to having "seen space crafts," asserted that aliens had implanted his body with metal bbs, and had seen "leprechauns" in 2004;" Kazulkina thus diagnosed delusional disorder, bipolar disorder, schyzotypal personal disorder, and assessed a global assessment functioning ("GAF") score of 45.[12] (*Id*.). Kazulkina ends her report by asserting that "[d]ue to the severity of his mental illness and his medication noncompliance, it is recommended that Mr. Martin be placed on an involuntary medication order." (Doc. 1 at 24).

On October 20, 2011, Garlapati completed a "COMPREHENSIVE PSYCHIATRIC EXAMINATION." (Doc. 1 at 25). Under the "chief complaint" section, Garlapati wrote that Martin was "[r]eferred for involuntary treatment due to medication noncompliance." (*Id*.). Garlapati noted that Martin admitted to seeing alien craft and believing that aliens could abduct humans without their knowledge, erase memories, and teleport. (*Id*.). Martin also admitted to believing that he could cast spells and curse others, causing them to become ill or suffer accidents. (*Id*.). He claimed to have seen leprechauns "twice during his life," which he alleged might have been caused by prison guards poisoning his food. (*Id*.). The "medical records" demonstrated that Martin spent long periods in segregation due to "anger, irritability, threatening and assaultive behavior associated with paranoid and bizarre delusions." (*Id*.). He engaged in a hunger strike in December 2009 due to fear that

---

[12] According to the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), a GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed., 2013) [hereinafter DSM–IV].

prison officers were poisoning his food. (*Id*.). In 1997 He "tried to tie a sheet around his neck," apparently as a means of committing suicide to escape "from the guards who he believes were harassing him." (*Id*.). Martin refused psychiatric medications because they had "harmful side effects," including damaging his liver and fertility; he demanded "herbal remedies" provided by a "native healer[]." (*Id*.). Martin also admitted to undergoing treatment for depression in his twenties, including the use of the antidepressant medications Prozac and Elavil, and admitted to using alcohol and marijuana starting around age twenty. (*Id*.). Garlapati found Martin's hygiene and grooming were "fair," his speech was "pressured with flight of ideas," his thought processes were "tangential," and he was irritable, paranoid, and delusional. (*Id*. at 26). He "denie[d] suicidal or homicidal ideations." (*Id*.). Garlapati diagnosed schizoaffective disorder, and also assessed a GAF score of 45. Garlapati concluded by writing in the "CMHP Proposed Plan of Service" box that Martin would be "started on haldol decanoate . . . and Prozac." (*Id*.). Martin notes that Garlapati failed to find that he was "a current danger to himself or others," and asserts that "she would of [sic] if she thought so." (Doc. 112 at 2).

In her October 20, 2011, examination report, Garlapati ordered that Martin "will be started on haldol." (Doc. 1 at 26). Martin alleges that he was administered Haldol on October 27, 2011 (*Id*. at 8-9), but the hearing committee did not issue its report until November 3, 2011 (*Id*. at 31). Therefore, it appears that Garlapati unilaterally ordered that Martin should be subjected to involuntary treatment pursuant to MDOC PD 04.06.183(R). That subsection makes clear that a prisoner can be involuntarily medicated "pending the convening of a Hearing Committee" only if "the examining psychiatrist determines that a

prisoner is mentally ill and is a present danger to himself or herself or to others, and the prisoner refuses treatment." *Id.*

Martin attaches to his complaint a copy of the order of the hearing committee, issued on November 3, 2011. This order contains very little detail, noting only that Martin was mentally ill, that the "proposed plans stated by the treating psychiatrist is [sic] suitable," that Martin was to be subjected to a ninety day course of involuntary medication, and that Makin, Stewart, and Webster all concurred in that decision. (Doc. 1 at 31).

As noted above, the Supreme Court clearly held in *Harper* that "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." 494 U.S. at 227. This language suggests that Due Process demands a finding of "dangerousness to self or others" in every case before a prisoner can be involuntarily medicated. Yet the Washington state prison policy at issue in *Harper* required that the prisoner be found *either* "'gravely disabled' or [that he] poses a 'likelihood of serious harm' to himself, others, or their property." *Id.* at 215. That prison policy defined "gravely disabled" as

> a condition in which a person, as a result of a mental disorder: (a) [i]s in danger of serious physical harm resulting from a failure to provide for his essential human needs of health or safety, or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

*Id*. n.3. Therefore, even a prisoner found "gravely disabled" would be counted a "danger," because his inability to make sound decisions regarding his health care would be detrimental to his health or safety. As restated by the Supreme Court, this policy required a finding that the prisoner suffered from a "mental disorder . . . which is likely to cause harm if not treated." *Id*. at 222. The policy applied exclusively to "inmates who are mentally ill and who, as a result of their illness, are gravely disabled or represent a significant danger to themselves or others." *Id*. at 226. The Court later characterized the policy as requiring that the prisoner be "dangerous to himself, or others, or their property." *Id*. at 232.

In *Green v. Dormire*, 691 F.3d 917 (8th Cir. 2012), a prisoner argued that under *Harper* a finding of dangerousness is required before involuntary medication can be administered. The Eighth Circuit held that *Harper* did not require a finding of dangerousness, because the statute in that case required a finding of *either* dangerousness *or* that the prisoner was "gravely disabled." *Id*. at 923-24. The *Green* court addressed a Missouri prison policy which also provided for involuntary medication where a prisoner's "mental illness interferes with [his] functioning in the institution, yet no immediate danger exists," including where the prisoner was found to be i) gravely disabled; ii) posed a future likelihood of harm to self or others; iii) suffered from delusions, hallucinations, or other thought disturbances, or iv) suffered from severely diminished institutional adjustment. *Id*. at 923. The Eighth Circuit concluded that this policy comported with the Fourteenth Amendment as set forth in *Harper*. *Id*.

21

In this case, neither Defendant Kazulkina, nor Garlapati, nor the hearing committee expressly stated that Martin was a danger to himself or others. However, it is clear that they equated the following facts with dangerousness justifying involuntary medication: Martin's paranoia, delusions, prior threatening and assaultive behavior[13], hunger strike, and noncompliance with medication that could prevent those symptoms. As evidenced by the policy in *Harper* and *Green*, danger is properly associated with those who are gravely disabled and unable to make coherent decisions about their own medical care. Danger is also associated with being delusional, hallucinatory, or suffering from other thought disturbances (such as paranoia) since those conditions could cause a person to harm themselves or others while under the delusion or hallucination. *See Harper*, 494 U.S. at 227, n.11 (finding that even where "utilization" of the relevant policy was "suspect," where an overview of the medical records showed a history of assaultive behavior, severe mental illness, and worsened symptoms when not medicated, the inmate's disorder "constituted a likelihood of serious harm to others").

Martin clearly suffers from symptoms which, if not treated with medication, create a risk of danger to himself and others. Martin's inability to recognize the difference between reality and delusion creates inherent risks to self and others, because he is unable to differentiate between friend and enemy, and between treatment and punishment. Additionally, as evidenced by his inconsistent willingness to making use of effective

---

[13] Martin readily admits to having thrown urine in the face of prison guards, but alleges that such incidents occurred years ago. (Doc. 86 at 11). There is thus no doubt that Martin has, at a minimum, engaged in assaultive behavior at some point in the past.

medication, Martin's delusions render him incapable of making rational decisions regarding his own health, endangering his wellbeing. Finally, while the defendants fail to provide any recent assaultive behavior on Martin's part, his own pleadings demonstrate that he is willing to harm others. Martin pleads that the Court should contact a prison guard by the name of "Taco" at the Baraga Correctional Facility, who Martin alleges will confirm that Martin bewitched him with magic, causing Taco to suffer illness. (Docs. 127 at 2, 130 at 2-3). While witchcraft is hokum, Martin nevertheless clearly believes in it, and in his own power to harm others with magic. That Martin willingly attempts to injure others is good evidence that he poses a danger to others.

Where Martin's involuntary medication was premised on a long history of assaultive, delusional, harmful behavior, it is clear that Martin poses a current danger to self and others. While the defendants in this case did not specifically use the phrase "danger to self or others," their findings satisfy that standard. Martin's Due Process rights were therefore not violated because the defendants' findings satisfied the spirit and meaning of MDOC PD 04.06.183.[14] That the decision of these medical personnel should remain undisturbed is further supported by the Supreme Court's cautionary reminder in *Harper* that the ultimate "decision to medicate" should "be made by medical professionals rather than a judge." 494 U.S. at 231.

---

[14] While the defendants in this case made findings which are tantamount to the finding of "danger" required by MDOC PD 04.06.183(R), they would be well served in the future by tailoring their findings to the specific wording of that policy. Had they satisfied both the spirit and the letter of that policy, much unnecessary litigation might have been avoided.

Finally, Martin asserts that summary judgment should not be granted because he has had insufficient time to perform discovery due to the Court's earlier stay, and thus cannot effectively argue against summary judgment at this juncture. (Doc. 127 at 1-2). Federal Rule of Civil Procedure 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Martin's Fourteenth Amendment claim fails because it is clear from the evidence before the Court that the defendants made well-supported findings which are tantamount to dangerousness, and thus satisfied Martin's procedural and substantive Due Process rights under the Fourteenth Amendment. Further discovery could not alter this conclusion, thus summary judgment should be granted as to all defendants on Martin's Due Process claim.

### 3.   Kazulkina Was Not Personally Involved in Martin's Medication Process

While the above findings are sufficient to dispose of Martin's Fourteenth Amendment claim against all parties, I find that Kazulkina would be entitled to summary judgment on another ground. I find that her role in Martin's involuntary treatment process was too remote, and that she was not personally involved in that process. It is axiomatic that "[p]ersonal involvement is necessary to establish section 1983 liability." *Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011). In *Bradley v. Goins*, No. C12-2020-RSM, 2013 WL 4809293, at *3 (W.D. Wash. Sept. 9, 2013), a prison psychologist "referred [a

24

prisoner] for involuntary medication in accordance with [Washington prison policy] on five occasions." The prisoner alleged that the psychologist was engaging in retaliation, and violated his rights under the Eight and Fourteenth Amendments. *Id*. at 4. The court found that the psychologist was "not authorized to prescribe antipsychotic medications or to approve the involuntary administration of antipsychotic medication," and that her role was "limited to preparing an Involuntary Antipsychotic Report for the . . . Committee," thus she had not "personally participated in the alleged violation of his Fourteenth Amendment rights." *Id*. at 5-6. Consequently, the court found that the prisoner could not maintain an action under the First, Eighth, or Fourteenth Amendments against the psychologist, and recommended that summary judgment be granted in the psychologist's favor, which was subsequently adopted. *Id*. at 8.

As in *Bradley*, Kazulkina's role in Martin's treatment was limited to recommending that he be considered for involuntary treatment with psychotropic medication and preparation of a non-binding report. Garlapati, not Kazulkina completed the psychiatric examination which initiated the involuntary treatment process under MDOC PD 04.06.183. (Doc. 1 at 25). Having no authority to order that Martin be involuntarily medicated, Kazulkina had no personal involvement in this matter, Martin cannot maintain an action against her, and Kazulkina's motion for summary judgment (Doc. 103) should be granted on Martin's Fourteenth Amendment Due Process claim for this additional reason.

Martin argues in a response[15] directed non-specifically at "defendants' motion for summary judgment" that summary judgment should not issue because he has not "had the chance to conduct any discovery." (Doc. 127 at 1). Martin's claims against Kazulkina fail because her role in this matter was merely to recommend that he be further examined for involuntary treatment, and she did not have the authority to order his involuntary treatment. Further discovery could not correct this deficiency, thus Kazulkina is entitled to summary judgment.

### 4.    Martin's First Amendment Retaliation Claim Against Kazulkina is Self-Defeating

A First Amendment retaliation claim consists of the following elements: (1) the plaintiff engaged in constitutionally-protected conduct; (2) the defendant's adverse action would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection exists between elements one and two, that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (6th Cir. 1999) (en banc); *Kennedy v. City of Villa Hills, Kentucky*, 635 F.3d 210, 217 (6th Cir. 2011).

As noted by Kazulkina, while Martin alleges that she engaged in "retaliation" against him, (Doc. 1 at 8-9; Doc. 103 at 14-18), his own recounting of the facts undercuts this assertion. Kazulkina undisputedly issued her report on October 19, 2011. (*Id*. at 24).

---

[15] Martin titles this document a "motion to deny the defendant's motion" (Doc. 127), yet in reality this appears to be a response to the defendants' various motions. The sole relief sought is that the defendants' motions not be granted. The remainder of his "motion" is comprised of statements asserting that he "is waiting" for action on behalf of the Court or the defendants, and that certain discovery is "needed" to demonstrate his claims. (*Id*. at 2). I will therefore construe his "motion" as a response.

Martin asserts that on October 26, 2011, Kazulkina informed Martin that he would be involuntarily treated with psychotropic medication, and that in response he "cuss[ed] out" Kazulkina and "call[ed] her names." (*Id*. at 8). Martin then asserts that in "malicious revenge, in retaliation, for plaintiff's name calling on 10-26-11, caused plaintiff to be forcibly drugged with haledol [sic] on 10-27-11." (*Id*.). This allegation is therefore erroneous for two reasons. First, Kazulkina did not possess the ability to "order" Martin be involuntarily drugged with Haldol, because pursuant to MDOC PD 04.06.183 she did not have the authority to enact such an order. (Doc. 1 at 24; MDOC PD 04.06.183(Q)). Kazulkina's power was limited to preparing a QMHP report suggesting that Martin suffered from mental illness and should be considered for involuntary administration of psychotropic medication, which she did via her October 19, 2011, report. Kazulkina's role in Martin's involuntary medication was thus merely to refer Martin to a qualified psychiatrist who could properly evaluate him for mental illness and initiate the process of administering involuntary treatment with psychotropic drugs. Kazulkina cannot be responsible for Martin's involuntary treatment where she lacked authority to order that he be involuntarily medicated under MDOC PD 04.06.183, and did not in fact order that he be involuntarily medicated.

Additionally, Martin admits that Kazulkina first recommended that he be involuntarily medicated with psychotropic drugs on October 19, 2011, seven days prior to the date on which he swore at her, called her names, and threatened to file a grievance against her. Where the alleged retaliatory conduct began before the plaintiff engaged in protected conduct, no retaliatory claim can be established. *See Mt. Healthy City Sch. Dist.*

*Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Thus, Kazulkina's recommendation that Martin be involuntarily medicated on October 19 could not have been in response to Martin's conduct which would not occur until one week later. Martin's First Amendment retaliation claim against Kazulkina is self-defeating, and summary judgment should be granted in Kazulkina's favor on this issue. Because Martin's First Amendment claim applied to Kazulkina alone, this analysis disposes of Martin's entire First Amendment claim.

### 5.      Martin's Eighth Amendment Claim Fails as to All Defendants

Makin, the psychiatrist sitting on the November 3, 2011, hearing committee, also moves for summary judgment. (Doc. 109). Makin asserts that he was "not involved in treating Plaintiff for administration of the Haldol, nor any reaction Plaintiff may or may not have had to it." (*Id.* at 1). True as this may be, it does not absolve Makin from the responsibility he bears as a member of the hearing committee. Courts have held that membership on a reviewing committee is sufficient to constitute personal involvement in several contexts. *See Jones v. Morris*, No. 14-CV-01157-JPG, 2014 WL 6616646, at *3 (S.D. Ill. Nov. 21, 2014) (holding that a prison officer who was either the "reporting officer or was a member of the hearing committee" had "some personal involvement" in the prisoner's alleged deprivation of constitutional rights); *see also Jones v. City of Port Arthur*, No. 1:12-CV-287, 2012 WL 6853909, at *11 (E.D. Tex. Dec. 5, 2012) ("However, Jones does allege that Thigpen was the chairman of the appeal hearing committee, and that the committee unanimously voted to uphold Jones's termination . . . . In light of these allegations, the undersigned finds Jones has put forth specific facts alleging that Thigpen

28

was 'personally involved' in Jones's racially motivated termination."), report and recommendation adopted, No. 1:12-CV-287, 2013 WL 149706 (E.D. Tex. Jan. 11, 2013). Where a prisoner alleges that psychotropic medication was involuntarily administered in contravention of prison policy and his constitutional rights, and where that prison policy dictates that an involuntary medication order can only be obtained via a hearing committee decision, the members of the hearing committee are obviously and intimately involved in the decision to involuntarily administer medication, and the prisoner may seek relief against those committee members. Therefore, Makin's motion fails on this ground.

However, Makin is nonetheless entitled to summary judgment based on his next argument that summary judgment should be granted with regard to Martin's Eighth Amendment claim in general. (Doc. 109 at 9). The Due Process Clause of the Eighth Amendment prohibits "cruel and unusual punishments" from being "inflicted." U.S. Const. Amend. VIII. The Eighth Amendment can be violated by either "acts or omissions." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

As to omissions, the Supreme Court held in *Estelle* "that deliberate indifference to serious medical needs of prisoners," *i.e.* lack of action in the face of medical need, violates the Eighth Amendment Cruel and Unusual Punishment Clause because it constitutes "unnecessary and wanton infliction of pain'" and is "repugnant to the conscience of mankind" by offending our "evolving standards of decency." 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 97, 104 (1976)). The deliberate indifference to a serious medical need inquiry incorporates objective and subjective elements into a two-pronged standard. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective prong is whether

the deprivation was "sufficiently serious" and the subjective prong considers whether the state of mind of the official was sufficiently culpable. *Id.* Where a prisoner suffers from an ailment and some form of treatment is provided, courts are reluctant to "second-guess the medical judgments of prison officials and constitutionalize claims which sound in state tort law." *Smith v. Sator*, 102 F. App'x 907, 909 (6th Cir. 2004).

As to acts, the infliction of beatings, torture, battery, or similar forms of punishment "maliciously and sadistically . . . to cause harm" constitute "excessive force," and in such cases "contemporary standards of decency always are violated." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *see also Foulk v. Charrier*, 262 F.3d 687, 702 (8th Cir. 2001) (finding an Eighth Amendment violation where an allegedly compliant prisoner was sprayed in the face with pepper spray, because such conduct was "malicious and sadistic use of force by a prison official against a prisoner, done with the intent to injure and causing actual injury"). Consideration of excessive force in violation of the Eighth Amendment also incorporates an objective element (*i.e.* whether the harm was sufficiently severe to violate a constitutional right) and subjective element (*i.e.* whether the official had a sufficiently culpable state of mind). *See Jackson v. Madery*, 158 F. App'x 656, 661 (6th Cir. 2005).

The Supreme Court has not directly addressed whether involuntarily medicating an inmate could run afoul of the Eighth Amendment's Cruel and Unusual Punishment clause. *See Hoyt v. Big Spring State Hosp.*, No. 6:15-CV-0003-BL, 2016 WL 7189844, at *13 (N.D. Tex. Dec. 8, 2016). A few courts have attempted to apply the framework of deliberate indifference to claims of involuntarily administered psychotropic medication. These decisions tend to focus on the side effects of the psychotropic medication rather than the

justification for their use in the first place. The prisoner in *Bomprezzi v. Kaprivnikar*, No. 11-CV-03344-REB-MEH, 2012 WL 7763089, at *4 (D. Colo. Aug. 3, 2012), report and recommendation adopted, No. 11-CV-03344-REB-MEH, 2013 WL 1124820 (D. Colo. Mar. 18, 2013), as amended (Jan. 22, 2014) argued that he was subjected to unnecessary treatment with antipsychotic medication, resulting in anxiety, suicidal thoughts, discouragement, drowsiness, hunger, and sensitivity to noise, thereby violating the Eighth Amendment. The court found that the prisoner's reaction to the medication was not sufficiently serious to satisfy the objective component of an Eighth Amendment claim, because the side effects were not so severe that even a layman would recognize the necessity for a doctor's attention. *Id.* The court also found that the subjective element of the deliberate indifference test was lacking, because there was "no allegation[] that [the prison guard] knew the antipsychotic medication might harm the Plaintiff and disregarded the risk of such harm." *Id.* Likewise, the court in *Elam v. Hernandez*, No. CV 09-02780-PA DTB, 2011 WL 2785676, at *6 (C.D. Cal. May 5, 2011), report and recommendation adopted, No. CV 09-2780-PA DTB, 2011 WL 2838183 (C.D. Cal. July 12, 2011) found that "Plaintiff alleges only that his [psychotropic] treatment was involuntary rather than inadequate. Neither a difference of opinion about the proper course of treatment nor a dispute over the necessity for or extent of medical treatment amounts to deliberate indifference."

Other courts have concluded that allegations of involuntary medication ought not be viewed through the lens of the Eighth Amendment at all. *See Moore v. Hoeven*, No. 3:08-CV-50, 2008 WL 4844130, at *4 (D. N.D. Nov. 5, 2008) ("This Court has identified

no caselaw recognizing cognizable Eighth Amendment claims based on involuntary medication . . . . This Court therefore recommends that Moore's claims as to involuntary medication and placement in administrative segregation be dismissed."); *Hendon v. Ramsey*, 528 F. Supp. 2d 1058, 1075 (S.D. Cal. 2007) ("The Court agrees with Defendants' assertion that 'the gravamen of Plaintiff's claim is that Defendants 'forcibly drugg[ed him] with anti-psychotic medications without due process' and therefore Plaintiff's claim is more appropriately analyzed through the rubric of the Fourteenth Amendment.").

A third group of cases have concluded that involuntary application of psychotropic medication could run afoul of the Eighth Amendment. These cases tend to focus on the motive behind the use of psychotropic medication, and consider whether the prisoner has made a colorable claim that medication was administered for the purpose of causing harm, *i.e.* under the rubric of excessive force rather than deliberate indifference. In *Thompson v. Bell*, 580 F.3d 423, 440 (6th Cir. 2009) the Sixth Circuit held that while the Supreme Court's decision in *Harper* and several other involuntary medication cases "addressed due process challenges and not Eighth Amendment claims, the logical inference from these holdings is that subjecting a prisoner to involuntary medication when it is not absolutely necessary or medically appropriate is contrary to the 'evolving standards of decency' that underpin the Eighth Amendment." Other courts have also concluded that involuntary and unnecessary treatment with psychotropic drugs may constitute cruel and unusual punishment. *See Mackey v. Procunier*, 477 F.2d 877, 878 (9th Cir. 1973) (finding that allegations of "medical experimentation to ascertain whether, by instilling of fright and infliction of pain, accompanied by psychological suggestion, behavior patterns can be

32

2:12-cv-14286-MAG-PTM   Doc # 143   Filed 02/21/17   Pg 33 of 42   Pg ID 949

affected . . . raise[d] serious constitutional questions respecting cruel and unusual punishment"); *Souder v. McGuire*, 423 F. Supp. 830, 832 (M.D. Pa. 1976) ("[I]nvoluntary administration of drugs which have a painful or frightening effect can amount to cruel and unusual punishment, in violation of the Eighth Amendment.").

While Martin asserts that he suffered from unwelcome side effects as the result of being administered Haldol (Doc. 1 at 10), the gravamen of his claim is not that he received insufficient treatment for these side effects[16], but rather that the defendants used unnecessary medical treatment as a cudgel, numbing his mind with psychotropic medication as punishment. (Doc. 1 at 7-9; Doc. 112 at 3). While he does not attempt to state a claim for deliberate indifference, the Sixth Circuit's decision in *Thompson* demonstrates that the inquiry cannot end here. Martin clearly alleges that he was subjected to involuntary administration of Haldol in violation of his Eighth Amendment rights (Doc. 1 at 3), and that defendants acted "maliciously and sadistically for the sole purpose of causing harm to plaintiff" (Doc. 112 at 3). Consequently, Martin's claim should be evaluated as an Eighth Amendment claim for excessive force in violation of the Cruel and Unusual Punishment clause.[17] The Sixth Circuit's decision in *Thompson* has determined in the affirmative that needless and involuntary medication with psychotropic drugs objectively constitutes sufficiently severe harm to violate the Eighth Amendment.

---

[16] Martin does not allege that he was administered Cogentin to counteract the effects of Haldol in an untimely manner, and does not even allege the amount of time that passed before he was administered Cogentin. Insofar as Martin might be read to raise a deliberate indifference claim, it is wholly undeveloped and merits no further consideration. Nevertheless, I note that even if he had developed that argument, it would fail under *Sator*, 102 F. App'x at 909.

[17] Indeed, Martin characterizes his involuntary medication as the "unnecessary, excessive use of force" in his motion for summary judgment. (Doc. 112 at 4).

Furthermore, Martin's allegation that he was unnecessarily drugged with the psychotropic medication Haldol for the purpose of punishment, and consequently experienced constant lethargy, blurred vision, difficulty breathing, slowed heartrate, and the feeling of being "in hell being tortured every second" (Doc. 1 at 10) assuredly states a claim for excessive force. Yet we are not here on a motion to dismiss, but rather must consider whether the entry of summary judgment is appropriate.

Makin asserts in his motion that summary judgment is appropriate because "[a]lleging forced medical treatment is insufficient to state a claim for an 8th Amendment violation," and because "Plaintiff has failed to set forth facts sufficient to support the subjective element of the 8th amendment claim showing 'prison authorities have denied [a] reasonable request for medical treatment in the face of obvious need.'" (Doc. 109 at 9) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). Makin thus addresses Martin's claim only insofar as it sounds in deliberate indifference, and fails to account for his claim as viewed through the lens of excessive force.

To maintain an excessive force claim, Martin must show that the defendants acted with a sufficiently culpable state of mind, and that he suffered a punishment sufficiently severe to violate his rights. These elements are intertwined here; if the defendants believed that they were administering treatment rather than punishment, Martin cannot satisfy either the subjective or objective prongs.

Courts which have concluded that a prisoner could sustain an Eighth Amendment challenge resulting from involuntary use of psychotropic medication have generally so concluded because the medication had no therapeutic value, and thus was either implicitly

or explicitly used as punishment. *See Knecht v. Gillman*, 488 F.2d 1136, 1138 (8th Cir. 1973) (concluding that the involuntary of apomorphine as a means of inducing behavior modification ran afoul of the cruel and unusual punishment clause because the drug was not being put to an accepted medical use); *Mackey*, 477 F.2d at 878 (holding that involuntary administration of a "fright drug . . . not recommended for administration to fully conscious patients, apparently because of its frightening effects," allegedly administered for the purpose of "medical and psychiatric experimentation" could constitute cruel and unusual punishment); *Pena v. N.Y. State Div. for Youth*, 419 F. Supp. 203, 211 (S.D.N.Y. 1976) (holding that the administration of the tranquilizer Thorazine as punishment violated the Eighth Amendment); *Nelson v. Heyne*, 355 F. Supp. 451, 455 (N.D. Ind. 1972), aff'd, 491 F.2d 352 (7th Cir. 1974) (finding the unconsented use of Thorazine to calm prisoners, without involvement of a physician either in prescription or review of treatment, violated the Eighth Amendment). These cases clearly stand for the proposition that involuntary treatment with psychotropic drugs, where not medically necessary, violates the Eighth Amendment prohibition on cruel and unusual punishment. The Sixth Circuit's holding in *Thompson* that "subjecting a prisoner to involuntary medication *when it is not absolutely necessary or medically appropriate*" violates the Eighth Amendment tends to confirm this conclusion. 580 F.3d at 440 (emphasis supplied).

The key question in resolving Martin's Eighth Amendment claim is therefore whether he was administered treatment or punishment. Some courts have found that "the mere characterization of an act as 'treatment' does not insulate it from eighth amendment scrutiny." *Knecht*, 488 F.2d at 1139. Likewise, the Supreme Court has held that "even a

clear legislative classification of a statute as 'non-penal' would not alter the fundamental nature of a plainly penal statute." *Trop v. Dulles*, 356 U.S. 86, 95 (1958). Therefore, the fact that the defendants in this case characterize the involuntary use of Haldol as "treatment" rather than "punishment" cannot, by itself, determine whether Martin can state an Eighth Amendment claim. We must dig deeper, and examine whether the treatment was in fact applied pursuant to medical need. If use of Haldol was medically appropriate, Martin cannot demonstrate that he suffered any "harm" at all, but instead experienced a benefit from the effective use of an antipsychotic medication to treat psychoses.

Martin has provided no evidence that he does not suffer from delusions, paranoia, and mental ailments which would justify the administration of Haldol. Quite to the contrary, he readily admits to suffering from delusions of the type which even a layman would recognize as indicative of severe mental illness, including the belief that he may have been implanted with bbs by aliens (Doc. 86 at 4), has personally seen an alien space craft (*Id*. at 6), can perform magic and cast spells on others (*Id*. at 5), and that he was poisoned with magic by prison guards (*Id*. at 8). Martin of course challenges that these beliefs are not delusional at all, but rather are an accurate depiction of reality. (*Id*. at 5-8).

While courts do not generally possess the expertise necessary to diagnose mental illness, the Supreme Court has repeatedly held that courts may (and indeed must) identify claims which are "so attenuated and unsubstantial as to be absolutely devoid of merit," are "wholly insubstantial," or are "obviously frivolous," because the courts "are without power to entertain [such] claims." *Hagans v. Lavine*, 415 U.S. 528, 536 (1974) (quotations omitted). Martin's statements regarding aliens, magic, leprechauns, and the like are

paradigmatic examples of attenuated claims which are so obviously frivolous that even a layman can identify and discard them. *See Maley v. Kansas*, No. 08-3146-SAC, 2008 WL 2549012, at *1 (D. Kan. June 24, 2008) (concluding that allegations regarding mind control devices and chip implants were "bizarre to the point of appearing delusional"); *Hiler v. Taylor*, No. 08-CV-333-SLC, 2008 WL 2810171, at *1 (W.D. Wis. July 18, 2008) ("Petitioner's allegations that he has several neural chips are clearly 'irrational' and 'wholly incredible' and his complaint will be dismissed as factually frivolous."); *Roum v. Bush*, 461 F. Supp. 2d 40, 46 (D. D.C. 2006) (dismissing as frivolous claims that the Central Intelligence Agency had implanted petitioner's body with foreign objects).

Referencing the evidence before the Court, we have on one side several findings by medical professionals that Martin was severely delusional, suffered from psychoses, and require psychotropic medication, supported by Martin's own clearly delusional statements regarding magic, aliens, and implanted devices. On the other side we have only Martin's own assertion that he is not mentally ill, along with reference to voodoo and magic and other practices which tend to confirm the opposite. There is not a shred of evidence in the record that Martin is not suffering from mental illness, and instead there is overwhelming evidence that he suffers from severe mental illness. I therefore cannot find that there is a question of material fact yet to be resolved regarding whether Martin suffers from some form of mental illness. This conclusion establishes that Martin's allegation that he was medicated with Haldol for no medical purpose whatsoever, but instead solely for the purpose of inflicting pain and punishment, is totally devoid of support. Martin's Eighth Amendment claim fails the objective prong, and summary judgment should therefore be

entered on this claim. *See Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999) ("To establish a constitutional violation under the Eighth Amendment, an inmate must meet both an objective and a subjective requirement.").

I further note that Martin Eighth Amendment claim also fails on the subjective prong. Martin alleges that he was involuntarily treated with Haldol as a means of punishment. Yet the reports drafted by Kazulkina and Garlapati (and which were reviewed by the hearing committee) contain numerous findings of delusional, paranoid beliefs and behavior which I have detailed above. (Doc. 1 at 23-28). These reports do not even hint that Martin should be administered Haldol involuntarily as a means of punishment. Martin would perhaps respond that these findings are a mere veneer of legitimacy, covering a dastardly plot to "cause harm to Plaintiff" through the "malicious[] and sadistic[]" application of unnecessary medication. (Doc. 112 at 3). Martin's only proof of this alleged plot is that Kazulkina "didn't say . . . in her recommendation" that he was a danger to himself or others, nor did Garlapati "believe" or "even allege" that he was a danger, and that the hearing committee "went along with" these deficient reports. (*Id*. at 2).[18] While Martin is correct that the defendants did not explicitly find him to be "dangerous," they rendered findings which, as I detailed above, were tantamount to the same. In any case, the lack of the word "dangerous" from the defendants' reports does not establish that they acted with malice. Instead, all evidence suggests that the medically trained defendants acted with the goal of treating Martin for what they reasonably perceived as severe mental illness.

---

[18] Martin also alleges that Kazulkina sought to have him medicated as retaliation, but as discussed above, Martin's own allegations contradict this claim.

As discussed above, Martin argues that summary judgment should not be granted because he has had insufficient discovery. (Doc. 127 at 1-2). Martin's Eighth Amendment claim fails only partially because he has failed to turn up any evidence of malicious intent on the part of defendants. Additional discovery could not correct Martin's failure on the objective prong of his Eighth Amendment claim. By all accounts, Martin suffers from severe delusions regarding magic, aliens, leprechauns, and other myths. That the defendants would make use of an anti-psychotic medication like Haldol thus appears to be consistent with medical need. This is particularly true where the use of Haldol to treat psychoses has been found appropriate in numerous cases. *See, e.g.*, *United States v. Bedros*, No. 06-249 (NGG), 2008 WL 2437865, at *2 (E.D. N.Y. June 13, 2008) ("According to Dr. Cheltenham, administering the psychotropic medication Haldol is an accepted and appropriate treatment for schizophrenia, disorganized type."); *Pelletier v. Magnuson*, 201 F. Supp. 2d 148, 157 (D. Me. 2002) ("The use of both long-acting and short-acting Haldol was an appropriate choice of medication to address Ronald's psychotic symptoms."); *Harrington ex rel. Estate of Thayer v. United States*, No. 4-00-CV-90486, 2002 WL 2022967, at *7 (S.D. Iowa Aug. 28, 2002) ("All medication experts who testified agreed that the as-needed short-term anti-psychotic medications Mr. Thayer received, oral lorazepam and haldol, could be effective in appropriate dosages."). While it is doubtless true that medication, surgery, and other medical techniques could be used as a form of punishment, all indications in this case suggest that Martin suffers from the very kind of mental illness for which administration of Haldol is appropriate. Because there is no

question of material fact left to resolve on this issue, summary judgment should be granted in favor of all defendants as to Martin's Eighth Amendment claim.

### 6.      Martin's Motion for Summary Judgment Should be Denied

Martin also moves for summary judgment against defendants Kazulkina, Garlapati, Makin, Stewart, and Webster. (Doc. 112 at 4). However, because my findings above have disposed of Martin's claims under the First, Eighth, and Fourteenth amendments, Martin has no remaining claims against any defendant. Because I recommend granting summary judgment as to all defendants on all of Martin's claims, I need not further consider his motion for summary judgment.

### 7.      Summary Judgment Should be Granted Against the Non-Moving Defendants

While not all defendants have moved for summary judgment in this matter, I find that entry of summary judgment in favor of all defendants is appropriate. *See In re Century Offshore Mgmt. Corp.*, 119 F.3d 409, 412 (6th Cir. 1997) ("[T]he fact that the nonmoving party has not filed its own summary judgment motion does not preclude the entry of summary judgment if otherwise appropriate."); *Crews v. Fannie Mae*, No. 2:11-CV-11656, 2012 WL 642067, at *6 (E.D. Mich. Feb. 8, 2012) ("A court dismissing a plaintiff's claims against moving defendants may sua sponte dismiss non-moving defendants as well where it is clear that the same ruling would inevitably apply to each of the defendants . . . . The same rule applies in the summary judgment context.") (quotation and citation omitted), report and recommendation adopted, No. 11-11656, 2012 WL 639327 (E.D. Mich. Feb. 28, 2012).

Martin's claims under the Eighth and Fourteenth Amendments cannot proceed against any defendant where it is clear that Martin received medically appropriate treatment rather than punishment, and where the defendants involved in his involuntary medication process rendered findings tantamount to dangerousness. Martin's First Amendment retaliation claim was raised against Kazulkina only, and has likewise been disposed of. Further, because Martin's claims each fail on the merits against all defendants, his complaint should be dismissed with prejudice.

### D.     Conclusion

Therefore, **IT IS RECOMMENDED** that Kazulkina's motion for summary judgment (Doc. 103) be **GRANTED**; Makin's motion for summary judgment (Doc. 109) be **GRANTED**, that Martin's motion for summary judgment (Doc. 112) be **DENIED**, Martin's "motion to deny the defendants' motion for summary judgment" (Doc. 127) be construed as a response rather than a motion, and that Martin's complaint be **DISMISSED WITH PREJUDICE**.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States*

*v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: February 21, 2017                          S/ PATRICIA T. MORRIS
                                                 Patricia T. Morris
                                                 United States Magistrate Judge


**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.  A copy was also sent via First Class Mail to Eric Martin #165780 at Marquette Branch Prison, 1960 U.S. Hwy 41 South, Marquette, MI 49855.


Date: February 21, 2017                          By s/Kristen Castaneda
                                                 Case Manager

42